51841 United States v. Ghiyadeen v. Ramdihall. May it please the Court, Angela Layman for Mr. Ramdihall. Thank you. Could you speak up a bit more? My voice is a little off. So, Mr. Ramdihall was the driver in the prior case. I will be addressing the Ohio stop and the Kittery, Maine stop, as Mr. Hiller's counsel said. The pertinent case is the Rodriguez matter that the Supreme Court decided during the pendency of this case. And that case says that you can't, that if the dog sniff, if the citation period has ended, and the dog sniff delays it, then that's illegal. And in this case, that's exactly what happened. Judge Hornby found, specifically found in his ruling, in the post-hearing ruling, I guess, to whether or not Rodriguez pertained, was that it ended. And then there was this extra either 6 to 13 minutes, depending on how you considered the traffic stop, since the officer, the trooper testified that his typical citation period was 10 to 15 minutes. That extra, if it was 10 minutes, then he was delayed an extra 13 minutes. As opposed to when he ended the citation, which would have given you the extra 6 minutes. So what he had at that point was this so-called furtive movement with the plastic bag, which I suggest should be given some skepticism, because the bag, in fact, did contain tobacco. There was nothing illegal in that plastic bag. There was no logical reason for him to have been furtive about it. What is he seeking to suppress? I, everything, that this was an illegal, that everything after the ending of the citation is illegal and should be suppressed. But who was he charged with? I believe. In Ohio, from the Ohio stop. Well, I believe that he was charged with everything that, I mean, he was held accountable for the credit card amounts for all of the three stops. That is a good question, Your Honor. I just, I mean, as a part of the whole thing, it was that he was held liable and completely guilty in connection with all of these. Was he charged with conspiracy? I believe so. For the Ohio credit cards? Well, he's, from the beginning, has moved to suppress all evidence seized from all of the different stops. And that was what the motion to suppress, and I will. I didn't think he was charged with anything from the Ohio. He pleaded guilty with regard to all of that after the hearing. And so that, and it was all a part of the motion to suppress in the hearing that was held. With all three stops, evidence entered against all, I mean, against both defendants. So my, after he was, provided the license and the registration, which is what the video shows, if you look at it and you see what the trooper is carrying, the trooper then immediately goes back to the car and calls for the dog sniff. And then he goes back again and brings my client back to the car where they have this conversation, which is apparent from the transcript that's included in the joint appendix, as well as the video itself, where they have this conversation. And my argument is that there was not reasonable suspicion with these initial circumstances to justify keeping them beyond the issuance of the citation, which would then result that everything after that was illegally seized and tainted and should be suppressed. And then with regard to the Kittery stop, in terms of standing, as I argued in the reply brief, the Brinlin case, because the, Mr. Ramdahal is arguing that he was illegally seized from the get-go, from the time his license was taken, that he has standing to object to his own personal seizure, as opposed to just the items in the car. And that that is where the judge wanted to be aired in jumping to the search of the car as the basis for standing, as opposed to the fact that they were stopped in a parking lot, he comes up and he takes the driver's license, walks off with it, and then there is no evidence that that was ever returned to him until you have the testimony that Detective Hazen, who arrived sometime later, took pictures of the driver's license and of Mr. Ramdahal. And then that was some 108 minutes total that this entire detention lasted. And it was not returned to them. I'm sorry, the seizure claim is they had his driver's license? That he was subjected to an illegal seizure. How? Because they only had a hunch. You mean he couldn't leave? It's not that they arrested him? Correct. He is in a car, he can't leave without his license. He couldn't just drive away without his license. And this court has said that before in the United States v. Miller case, which I cite in my reply brief. You can't expect someone to just drive off when police are holding a license. Can I ask about the information that was taken from the strips? I argued that as a part of joining in with Mr. Hilliard on that argument. I'm saying it's not fundamental to your law. The information that was gleaned from it, if we threw it out, just assumed it couldn't have been acquired, what significance would it have? I'm just not following what the significance of suppressing it is. How did it advance the government's case, the information taken from the strips? I understand how getting the cards was significant. What's the significance of the information from the strips? If it's the potential of the kind of evidence the government can get. No, what they got. You're trying to suppress what they got from the strips. And what they got, my understanding is, is a series of numbers which either did or didn't match the numbers on the front of the cards. And if those numbers then matched up with illegal purchases, or if those cards were used for illegal purchases, I know that my client is subjected to a significant restitution order of like $57,000 or something like that. And I apologize, I don't know specifically what of that amount pertains to Ohio. Do we have even an indication that the numbers taken from the strips were relied on, as opposed to the numbers taken from the face of the card to generate the restitution order? Because if not, then who cares if we just exclude the information taken from the strips? But the ultimate evidence taken by the government that's then used as a basis for furthering the case or the restitution or as a part of their investigation, so if all of that was suppressed. Wouldn't just what's on the face of the card be? But if you just take the face of the card, how do you know whether it's fraudulent or not? How do you know from the number on the strip whether it is? Because my understanding is if there's an issue with the numbers not being completely matched up when they ran the card and the ones that did not match up, that's a clear sign that it's a fraudulent card. Or if there's nothing on the back of it at all, I mean I question the cards that matched up both with the magnetic strip and the numbers. How do you determine that those are fraudulent? But for the other ones, that's the only way they tell that these cards, as I understand it, I mean my sister can correct me if I'm wrong on that, but that's how they determine that there was something wrong with these cards. Because otherwise how do they know if his name is on the card? Pardon me for the basic question, but the cards had the name of the passenger, not Ramdahal. Correct. But Ramdahal was charged with conspiracy to further this credit card scheme? Yes, well I believe that's what he pleaded guilty. I didn't think he was charged. Yes. Why is Ohio pertinent given the charges made against your client? What were the charges made against your client? Tell you what, why don't you and the government send us a letter, a joint 28-J letter, just clarifying this point after oral argument. Yes. Thank you. Good morning again, Your Honor. Are you able to clarify, I mean I know Mr. Ramdahal was charged as a result of the main stuff, but was he charged? I thought he was let go in Ohio. There were a number of, he was released in Ohio, Ramdahal. Ramdahal. There were a number of substantive charges and I don't have them handy, but I will submit them. He ultimately pled guilty to conspiracy to commit access device fraud and I think that that's why each of the locations where fraudulent cards were found would have gone into the overall conspiracy from all three of the encounters, two in Maine and this one in Ohio. And Judge Barron, the information on the cards, again Trooper Wells testifies briefly at that citation I gave before, the significance is just like at a store, those numbers should match. Whatever is on that magnetic strip should be identical to what's embossed on the front of the card. It's a financial institution identification number, sometimes it's the account number, that CSC number. So that is the significance. They should match and the fact that they don't is an indicator that the cards are counterfeit or they've been manipulated. So the information taken from the strip is necessary to demonstrate the fraudulence of the card. It's one way of demonstrating it. You could also demonstrate it by showing fraudulent purchases just from the number on the face of the card. Exactly. But the government apparently chose to use both methods here. Yeah, and I don't have, because sensing hasn't been an issue, I haven't gone through the details of restitution or anything like that or how that actually factored into, say, restitution or other sentencing factors. Just so I get the idea, if you get stopped on the street and they take your wallet, the idea is they can then run all your credit cards through a search app, fix the strip, all the information is on the strip? I think they would need some sort of reasonable suspicion to pursue just a regular speeding stop. They would what? I think there was a lot more than that by the time they found the cards in this case. In fact, they had probable cause by the time they found the cards. I see. So I guess what I'm asking is, is there an expectation of privacy in the information on the strip, according to the government, yes or no? The case law suggests that there is. But then you don't need reasonable suspicion. Arguably not, but here we clearly had it. To do the further search. To do the strip. And is the test, is the right legal center for that reasonable suspicion or is it probable cause? If we imagined you had an expectation of privacy in the information on the strip. If you have an objectively reasonable expectation of privacy on the strip. I don't know, Your Honor. I'd want to research the cases that we have. For instance, in Campbell. So I guess I'm just trying to think. There's a bunch of different ways you could resolve this question. One is there's no reasonable expectation of the information on the strip. Therefore, the search of the information is no problem. Alternatively, you only need reasonable suspicion to do a search of the information on the strip. You say there's reasonable suspicion. A third possibility is you need probable cause to search the information on the strip. And that might matter because I haven't heard the government argue that you have probable cause. Oh, I think we've made a very good argument. Right. As to Maine. Oh, I don't think the strip, magnetic strip search is an issue in the Maine Catering Stock. It was only the Ohio. Okay. So, you had Parker Martin who at his investigator's direction went back to the cruiser. After they found the 17 Visa cards secreted in the trunk. At which point, Campbell is a good case, there was probable cause. We would submit at that juncture. Probable cause to search? To do that. That's why. I'm not saying that they needed it. But by the time the dog had alerted that they searched for drugs, they'd have to find this packet of Visa cards secreted in the trunk bound up with a rubber band. I think there's an argument that at that point they had some probable cause to believe that some sort of fraud was underway. But the cases we cite, the case law suggests that the whole point of that information is to give it to third parties. And therefore, there is no reasonable expectation of privacy. And that gets to, as Judge Lynch, you mentioned, even if there were, in this case, there's no evidence that these cards had that, these strips gave the opportunity to go find more private data or historical. That seems like an odd way of doing it. Which is you do the search and you find out that it's information that's not that big a deal. And therefore, it was okay to do the search. Oh, no. I think the investigators and those who are well versed in this know that the information, at least currently, there may be years down the line where it gets considerably more private. But currently, they know that what should be on that strip is exactly what's on the front of the card. And that's the financial identification number, the account number. That's the ESC number. And sometimes the defendant's, that's the card holder's name. So at least on the current. But the whole reason they're doing the search is because their expectation is that it won't be that information because it won't match. It's just like, I think, the analogy is the driver's license scan or a VIN number on a car. You look under the hood, you see the VIN number inscribed there, and you match it up to the vehicle registration documents to see if it matches. It's just that the comparison of matching numbers, at least in this case and on the case law that we have. But the premise of the question seems to suggest that only once you've run the magnetic strips, do you have reasonable suspicion of some credit card fraud. But, in fact, we have a whole bunch of credit cards all in one person's name, which suggests it's unlikely they are genuine credit cards. Correct. Which would support a further search unit if we assumed it. No, but I guess what I was asking is whether the government thinks you need probable cause at that point or just reasonable suspicion. I don't, I think the case law supports that you could, I think we had enough. If you had to satisfy probable cause, you think that would be met too? In this case, that would be met. Yeah. Yes. Okay. And with respect to the Kittery encounter, I just want to make a point on the alleged retention of the identification documents. Because when I reviewed the record, Brosnan wasn't asked when he returned the documents. And none of cross-examination suggested that he held them the entire time. I reviewed the record again for today. And the December 9, 2014, oral argument on the suppression motions, Randall Hall's attorney said, he highlighted that Brosnan had stepped aside to look at the documents with that flashlight. And the district court interjected. He said, well, he does return them, doesn't he? And this is transcripts docketed at number 170, page 45. Defense counsel replied, this is Randall Hall's attorney. He does, but not until he's taken them to the side and held them for a while. And then Randall Hall's attorney says, what's the very next thing that he does, meaning after he returns the documents? He asks Solaire out of the car, saying that it's become custodial. So I think that may be why, because Randall Hall agreed below that the documents were returned in some sort of timely fashion, why the district court didn't make an explicit finding. And this just wasn't a particular issue below. So with that, unless the court has further questions about the Kittery stuff or Ohio, we'll submit. Thank you. Thank you.